UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DAVID E. GLIDEWELL and | ) | Case No. 10-13935-JDW |
| PATRICIA G. GLIDEWELL, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |

---

| | | |
|---|---|---|
| RENASANT BANK, | ) | |
| | ) | |
| | ) | A.P. No. 11-01105-JDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DAVID E. GLIDEWELL, | ) | |
| PATRICIA G. GLIDEWELL, and | ) | |
| GLIDEWELL TRAILER SALES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

This matter comes before the Court on a Complaint to Determine Dischargeability of Debt filed by Renasant Bank on May 3, 2011. Appearing at the final hearing on February 26, 2013, were Scott Hendrix, counsel for the Plaintiff Renasant Bank (the "Plaintiff") and Steve Livingston, counsel for the Debtor/Defendants David E. Glidewell and Patricia G. Glidewell (collectively, the "Debtors"). Scott Williams and Thom Floyd, corporate representatives of the Plaintiff, and Patricia G. Glidewell also appeared and testified at the hearing. The Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's Order Of Reference Dated August 6, 1984. This is a core proceeding as set out in 28

1

U.S.C. §157(b)(2)(I). At the trial, the parties agreed that there are no jurisdictional issues and consented to entry of final judgment by this Court. This Court must decide whether the debt owed to the Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[1] Plaintiff's chief complaint is that while Titan granted Plaintiff a security interest in all accounts receivable, instruments, intangibles, equipment, inventory and documents owned by Titan, Titan did not own any such assets. Instead, the assets were owned by an affiliated, but separate, company also owned by the Debtors. This Court has considered the pleadings, testimony, exhibits and the law, and finds and concludes as follows.[2]

## I. FINDINGS OF FACT

Plaintiff is a banking corporation organized and existing under the laws of the State of Mississippi, with its principal office in Tupelo, Mississippi. The Debtors are individuals who were the owners, sole shareholders, officers and directors of Glidewell Trailer Sales, Inc. ("GTS"), a now-defunct Mississippi corporation.[3] The Debtors operated GTS from 1991 through 2010 as a dealer of other brands of trailers and motor coaches and also as a repair facility for trailers and motor

---

[1] The Complaint states causes of action under §§ 523(a)(4) and 523(a)(6) in addition to § 523(a)(2)(A), but counsel for the Plaintiff acknowledged at the onset of the final hearing that the Plaintiff was seeking a determination of nondischargeability solely under subsection (a)(2)(A).

[2] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[3] The Debtors' bankruptcy petition lists "dba Glidewell Trailer Sales, Inc." as a trade name used by David E. Glidewell, but Glidewell Trailer Sales, Inc. ("GTS") was incorporated and is a separate legal entity that is not a debtor in this bankruptcy case or any other. The Plaintiff named GTS as a Defendant in this matter, but since the Plaintiff is solely seeking a determination of nondischargeability, and GTS is not a debtor, GTS is due to be dismissed as a defendant herein.

coaches.[4] In 2005, the Debtors formed Titan Coaches & Trailers, Inc. ("Titan"), of which the Debtors are also the sole owners, shareholders, officers and directors. Titan was incorporated by the Debtors to build large-scale motor coaches on truck chassis under the Titan brand name for GTS to sell to the public. Titan and GTS operated out of the same facility in Corinth, Mississippi. Mrs. Glidewell, who has a high school education, performed the bookkeeping functions for both companies, and Mr. Glidewell supervised the sales, repair, and build-out operations and employees. The parties agreed that Mr. Glidewell made no representations to Plaintiff, other than any representations included in the Forbearance Agreement discussed below. All communications and negotiations were through Mrs. Glidewell.

### A.   The Corporate Structure.

Titan bought multiple motor coach chassis, mostly from Freightliner, in 2006 and 2007, upon which Titan intended to build motor coaches suited for on-the-road living. The chassis manufacturer issued a certificate of origin on each chassis. Once the build-out on a motor coach was completed, Titan would issue a certificate of origin as well, and the two certificates of origin together would be submitted to become the certificate of title on a completed motor coach transferred to a third-party purchaser by GTS. Titan was unable to sell the motor coaches it manufactured directly to the public, because Titan did not have a Mississippi dealer's license. Titan never kept any money in a bank account, never sold trailers or motor coaches to the public, and never had any employees, accounts receivable, materials, inventory, or equipment. GTS purchased various inventory and

---

[4] The Debtors have since incorporated another business actually named "GTS, Inc.," which is not involved with the matters at issue in this case and which need not be discussed further. For ease of reference, the abbreviation "GTS" is used in this Memorandum Opinion to refer only to Glidewell Trailer Sales, Inc.

equipment for the build-out and repair of motor coaches, and these materials were used by both GTS and Titan in their day-to-day operations. GTS owned the materials and sold the final product to the public, but Titan manufactured that product and became the owner upon completion. In automotive parlance, GTS was both the tier one supplier and the dealership. Titan was the original end manufacturer, commonly known as an OEM. Neither GTS nor Titan stockpiled inventory dedicated to the build-out of any particular trailer or motor coach.

In its initial phase of operations, Titan completed two motor coaches to use as demonstration units. Thereafter, Titan directed its work force (which consisted solely of employees of GTS and not Titan) to work first on units that had been ordered by a customer. Work usually only began on a specific motor coach once a customer had placed an order and deposit for that specific motor coach. This allowed the customers to choose finishes and amenities they preferred in their motor coach and allowed Titan to use the customer's deposit money for the materials and labor necessary to complete the selected coach. Although it was Titan's practice to complete a motor coach only after a customer placed an order for that specific motor coach, occasionally work would be done on "spec" coaches if there were no pending sales or repairs to be made. In its corporate life span, Titan completed approximately twelve motor coaches, but had approximately eight repossessed by banks holding first liens.

### B.  **The Renasant Loans.**

Sometime in December 2005 or January 2006, the Debtors, individually and on behalf of Titan, executed and delivered to the Plaintiff two separate Multipurpose Notes and Security Agreements, of which there were multiple later renewals (collectively, the "Notes"). Titan also authorized certain UCC financing statements and other security documents to be filed evidencing

and securing the amounts due to the Plaintiff under the Notes. The Notes were secured by first liens on two Freightliner Motor Coaches owned by Titan with vehicle identification numbers ending in -3476 (hereinafter referred to as the "White Unit") and -0664 (hereinafter referred to as the "Red Unit," and together with the White Unit, collectively, the "Motor Coaches"), and purportedly all accounts receivable, instruments, intangibles, equipment, inventory and documents of Titan.[5] GTS was not a party to the Notes, and GTS did not pledge any of its property as security for the Notes, but both GTS and the Debtors individually guaranteed repayment of the Notes. The purpose of the loans evidenced by the Notes was to purchase the chassis and build-out the Motor Coaches. Scott Williams testified that the proceeds of the loans should have been sufficient for this purpose, and that the Debtors never requested additional funds to complete the Motor Coaches, but the Notes did not require escrow or segregation of the loan proceeds. The proceeds of the loans to Titan were deposited into a general bank account owned by GTS and used for the purchases of the chassis, materials, and in the general operation of GTS.

Mr. Williams testified that he became involved with the loan to the Titan in July 2007. Mr. Williams was not involved in the origination of either of the loans, and he was not involved in the initial decision to extend credit to Titan, guaranteed by GTS and the Debtors. As special asset officer for the Plaintiff, Williams testified that "distressed" files get transferred to him from the

---

[5] In reviewing the Notes and associated documents, there does not appear to be any language granting the Plaintiff a security interest in any property of the Debtors, GTS, or Titan other than the Motor Coaches. The UCC financing statement for the Red Unit loan includes accounts receivable, instruments and chattel paper, general intangibles, equipment, inventory, and documents in the list of collateral, but the Court cannot identify any source of any such security interest from the evidence submitted. However, the Debtors admitted such a lien in their answer to the Complaint, so the Court will proceed as if such a lien was granted on that collateral as well.

5

banker originally involved in the transaction. Mr. Williams was the loan officer on the 2007 renewal of the Notes, and he first inspected the GTS/Titan facility in July 2007, upon the transfer of the Titan loan file to his office. Mrs. Glidewell led him on a tour of the facilities on each occasion he visited. Mr. Williams inspected both Motor Coaches as well as the warehouse holding a significant amount of material for building out motor coaches, such as aluminum, steel, shelving, bins, steel, commercial hitches, and interior amenities such as microwave ovens. Mr. Williams testified that he assumed that the building materials and inventory were owned by Titan, but that he never asked which entity owned the materials and inventory, and the Debtors never told him. Mr. Williams noted that from his observations, Titan was in full-swing production of motor coaches, with sufficient inventory to complete three to four motor coaches. Further, Mr. Williams testified that from his inspection in July 2007, the White Unit was incomplete, but the Red Unit seemed to be complete, appearing fully equipped with appliances and electronics such as a refrigerator, television, stereo and generator. The Debtors did not tell him that none of the equipment was permanently attached to the Red Unit or in working condition, and that the only reason the Red Unit appeared complete was that the Debtors had staged it for showing as a demonstration model at a trade show. Mr. Williams testified that he inspected the Plaintiff's collateral (the Motor Coaches), and what he thought was the Plaintiff's collateral (the equipment and inventory), at least two more times, and that he always witnessed good inventory, building and sales activity, and staff onsite. Mr. Williams further testified that the Plaintiff based its decision to extend, and continue to extend, credit to Titan on the representation that there was sufficient inventory to build-out the Motor Coaches. Finally, Mr. Williams testified that if the Debtors had disclosed that GTS owned all the equipment, inventory, materials, and receivables, the Plaintiff would have requested a lien against GTS's property as well

as a condition to the extension of credit. Mr. Williams testified that Mrs. Glidewell told him that the materials in the warehouse (later found to be owned by GTS) were used in the construction of coaches built by Titan. However, Titan owned only the chassis and whatever was permanently bolted to the chassis, and thus the Plaintiff held a perfected lien only against the Motor Coaches.[6] Although the materials were owned by GTS, Mrs. Glidewell testified that the materials were available to be used, and were used, by Titan in the construction of motor coaches and trailers.

On or about February 2, 2009, the Debtors, GTS, and Titan entered into a Forbearance Agreement with the Plaintiff, in which the parties acknowledged that the Notes were in default for Titan's failure to make payments when due, failure to complete the construction of the Motor Coaches, and failure to pay off the balance due under the matured Notes. The Forbearance Agreement provides that was entered into "in an effort to allow [Titan] the *opportunity* to *attempt* to complete the Motor Coaches and sell the same as completed units and in order to allow [Titan, the Debtors, and GTS] a better *opportunity* to satisfy their obligations to [the Plaintiff] under the Loan Documents." (emphasis added). Mr. Williams testified that the Plaintiff would not have entered into the Forbearance Agreement if he had known Titan owned no inventory. However, the Debtors did not make any representation or warranty in the Forbearance Agreement regarding the ownership of any inventory, materials, equipment, or other property, nor did they make any representations or warranties regarding the status of completion of either of the Motor Coaches. Again, Plaintiff never asked. In the Forbearance Agreement, Titan did represent to the Plaintiff that

---

[6] Thom Floyd also testified on behalf of the Plaintiff. His testimony was duplicative of that of Mr. Williams. Mr. Floyd also took Mrs. Glidewell-led tours of the facilities, observed the same level of activity and materials as Mr. Williams, and also assumed that Titan owned those materials, but never asked Mrs. Glidewell about their ownership.

7

"it ha[d] the capacity, ability, materials and wherewithal to complete the Motor Coaches on or prior to February 27, 2009, and to sell and market said Motor Coaches thereafter." Mrs. Glidewell testified that although the manpower and materials were available to finish the Motor Coaches, Titan did not attempt to finish the Motor Coaches during the term of the Forbearance Agreement, because there was no buyer identified for the Motor Coaches, and Titan, GTS, and the Debtors did not want to work on something that was just going to "sit on a shelf."

Titan's failure to complete the Motor Coaches by the February 27, 2009 deadline constituted a material breach of the Forbearance Agreement justifying immediate termination of that agreement. Pursuant to Paragraph 10 of the Forbearance Agreement, Titan and the Debtors had agreed to the repossession of the Motor Coaches without further process upon default under that agreement, but the Debtors refused to allow the Plaintiff's representatives on the property. The Plaintiff filed a replevin action in state court in order to repossess and sell the Motor Coaches. A final judgment of replevin was entered on December 10, 2009, and the Motor Coaches were repossessed by the Plaintiff later that day. Following the repossession, the Plaintiff sold the Motor Coaches through a Tupelo auto auction and applied the proceeds of the sales to the indebtedness due under the Notes. Plaintiff's claim under the Notes against the Debtors individually and GTS was reduced to final judgment on February 17, 2010, by the Alcorn County, Mississippi, Circuit Court, in the amount of $275,220.28, plus post-judgment interest and attorneys' fees.[7]

Debtors listed the debt to the Plaintiff as a general unsecured debt in their bankruptcy schedules. (Doc. 1, Sched. F). Plaintiff brought this adversary proceeding seeking to have this debt

---

[7] The Court notes that because of the state court judgment, the Plaintiff has a judgment lien against all non-exempt property owned by GTS and thus backed its way into the lien it always thought it had.

determined nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## II. CONCLUSIONS OF LAW

Section 523 of the Bankruptcy Code outlines certain exceptions to discharge in bankruptcy proceedings. Exceptions to discharge are to be construed strictly against the objecting creditor in order to give effect to the fresh start policy of the Bankruptcy Code. *See Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)(*citing Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. 1982). An objecting creditor bears the burden of proving the elements of nondischargeability by a standard of a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). Plaintiff alleges that this debt is nondischargeable pursuant to § 523(a)(2)(A).

Section 523(a)(2)(A) provides that a debt for money, property, services, or an extension, renewal, or refinancing of credit will not be discharged to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a). The Fifth Circuit has distinguished between "actual fraud" and "false pretenses and representations," and so there are two distinct paths to a conclusion of nondischargeability under that subsection. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). In order for a debtor's representation to be a "false representation or false pretense," it must have been "(1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party." *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995)(citations omitted); *see also Field v. Mans*, 516 U.S. 59, 73-75, 116 S. Ct. 437, 445-446 (1995) (holding that section 523(a)(2)(A) requires subjectively justifiable, but not objectively reasonable, reliance). In order to conclude that a debt is nondischargeable on the basis of "actual fraud," the

objecting creditor must prove that "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations." *RecoverEdge*, 44 F.3d at 1293 (citations omitted).

In this case, the Plaintiff has not proven the first element of false pretenses or false representations (a knowing and fraudulent falsehood) or the second or third elements of actual fraud (debtor knew representations were false at the time the representations were made, and made the representations with the intent to deceive). Plaintiff has not pointed to any falsehood in any of the documents related to the Notes, including the Forbearance Agreement, and the testimony of neither Mr. Williams nor Mr. Floyd supports the allegation that the Debtors made any misrepresentation to the Plaintiff whatsoever. The Plaintiff contends that such falsehoods include misrepresentations as to the use of funds advanced to Titan under the Notes, the ownership of the materials, inventory, and accounts receivable, the completion status of the Red Unit, and/or the ability of Titan to complete the Motor Coaches in a timely fashion. No evidence was presented that the Debtors made any false representations regarding the use of the proceeds received from the Plaintiff. The loan documents did not require that Titan or the Debtors escrow the money or otherwise keep it segregated from other funds. Mrs. Glidewell credibly testified that the Titan bank account was only used to purchase the chassis and that otherwise, Titan operated in conjunction with GTS.

Next, both Mr. Williams and Mr. Floyd admitted that neither Debtor ever told them that Titan owned any bank accounts, equipment, inventory, materials, or accounts receivable. Likewise, both Mr. Williams and Mr. Floyd admitted that they did not ask either Debtor if the equipment,

inventory or other property was owned by Titan. Obviously, the Plaintiff knew of the existence of GTS, as GTS was a guarantor of the Notes. Mr. Williams and Mr. Floyd further testified that they both assumed that the Red Unit was complete, but that such assumption was based on their observations and not on any statements made by the Debtors. Finally, Mrs. Glidewell testified that Titan had access to the materials to complete the Motor Coaches (which was true), but chose not to do so because there was no buyer. Titan had always used the GTS materials in building Titan motor coaches and trailers, and Mrs. Glidewell testified that Titan would have used GTS materials to complete the Motor Coaches should either have been selected by a customer for purchase. Although it appears as though there may have been a misunderstanding on the part of the Plaintiff as to these facts, any such misunderstanding was not due to any falsehood or misrepresentation made by either of the Debtors.

Finally, even had the Debtors made the alleged misrepresentations to the Plaintiff, the Plaintiff has not met its burden as to the element of reliance required by either the actual fraud theory or false representations/false pretenses theory of nondischargeability. Although Mr. Williams and Mr. Floyd testified that the Plaintiff would not have extended credit to Titan on the terms that it was extended had it known Titan did not own the materials, neither Mr. Williams nor Mr. Floyd was involved in the initial extension of credit to Titan. The Court concludes from the evidence presented that the deals Mr. Williams and Mr. Floyd were involved in with the Debtors – the continued renewal of the Notes and the Forbearance Agreement – were entered into by the Plaintiff in order to preserve the Plaintiff's collateral and to give Titan and the Debtors time to complete the Motor Coaches in an attempt to maximize the return to the Plaintiff. The materials were available to Titan to complete the Motor Coaches, but Titan made the business decision to not do so. By failing to

11

complete the Motor Coaches, Titan, the Debtors, and GTS simply breached their contracts with the Plaintiff. The Plaintiff repossessed and sold its collateral and obtained a deficiency judgment against the Debtors.

While the Debtors clearly breached their contracts with Plaintiff, and the deficiency judgement is a valid debt, the Plaintiff has not carried its burden to prove that the Debtors committed any act sufficient to declare the debt nondischargeable under § 523(a)(2)(A). Plaintiff requested and was granted a blanket lien on the assets of Titan. Plaintiff requested and was granted a guaranty of the debt from GTS. Plaintiff never requested a lien on the assets of GTS and none was offered. There was clearly a misunderstanding regarding ownership of the inventory, equipment and other assets, but this misunderstanding occurred during the initial underwriting for the loans in 2005 or 2006, and was perpetuated throughout the renewals of the loans. This misunderstanding was not based on any knowing falsehood of the Debtors.

The closest question stems from an analysis of the Forbearance Agreement. In the Forbearance Agreement, Titan made the representation that it owned the Motor Coaches, which is true. Titan agreed to take any action necessary to ensure that Plaintiff had a first priority lien on the Motor Coaches. There is no dispute that Plaintiff did have the first lien and the Motor Coaches were later repossessed. Titan made no such representations with regarding to ownership of any other assets. Titan did represent that it had the "capacity, ability, materials and wherewithal to complete the Motor Coaches..." All of this was true. The testimony was clear that Titan could have completed the Motor Coaches at any time. The materials were available to be used in the joint facility occupied by Titan and GTS under the same arrangement that had existed since the formation of Titan in 2005.

All indications are that the Debtors, Titan and GTS granted to Plaintiff every security interest

12

requested by Plaintiff. The testimony is clear that at no time were the Debtors asked which entity owned the inventory, equipment and accounts receivable. As detailed above, the Debtors never made a knowing false representation regarding the ownership of that collateral in the documents.

The Court found Mrs. Glidewell's testimony to be credible in that she made no knowing or fraudulent false statements. The Court also found Mr. Williams and Mr. Floyd to be credible in that they believed Titan owned the additional collateral. It was simply a mistaken assumption based on the fact that they inherited the files with the initial faulty underwriting. However, this is not a mistake that can be blamed on the Debtors, because Mrs. Glidewell was never asked and had no reason to know it was an issue, because it was never discussed. *See Old Republic Nat'l Title Ins. Co. V. Levasseur (In re Levasseur)*, 482 B.R. 14, 29 (Bankr. D. Mass. 2012)(holding that a party has a duty to correct what would otherwise be a false impression if that party is aware of an existing misunderstanding). It certainly does not rise to the level of a knowing false representation or actual fraud, as the Debtors were unaware of the Plaintiff's misunderstanding. *Id.* ("[A]s is implicit in the requirement of fraudulent intent, [a] false pretense must be deliberately fostered and not merely the result of inadvertence."). As objections to discharge are construed strictly against objecting creditors, the Plaintiff has the burden *(Hudson,* 107 F.3d at 356), but has failed to carry that burden, and the debt to the Plaintiff is dischargeable.

### III. CONCLUSION

This Court finds and concludes that Plaintiff has failed to satisfy all the elements of 11 U.S.C. § 523(a)(2)(A) under either an actual fraud theory or a false representations/false pretenses theory, and that the debt owed to the Plaintiff is dischargeable. Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the debt owed to Renasant Bank is

13

determined to be **DISCHARGEABLE**.  A separate final judgment *shall be* entered contemporaneously herewith.

Dated this _9th_ day of April, 2013.

_____
Jason D. Woodard
United States Bankruptcy Judge